IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Bankruptcy No. 18-70524-JAD |
| JERRY DWANE DEWITT AND ARLENE RAE DEWITT, f/d/b/a BUCK DEWITT CONSTRUCTION, | Chapter 13 |
| Debtors. | |
| JERRY DWANE DEWITT AND ARLENE RAE DEWITT, f/d/b/a BUCK DEWITT CONSTRUCTION, | Doc. No. Related To Doc. No. 77 |
| Movants, | |
| V. | |
| FIRST NATIONAL BANK OF PENNSYLVANIA, | |
| Respondent. | |

### MEMORANDUM OPINION

The matter before the Court is the *Debtors' Motion for a Rule 2004 Examination* (the "Motion," ECF No. 77) filed by the Debtors, Jerry Dwane DeWitt and Arlene Rae DeWitt f/d/b/a Buck DeWitt Construction (the "Debtors"). In short, resolution of the Motion requires this Court to determine whether the Debtors are entitled to an examination under Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004"), by way of a deposition of a designated agent(s) of

First National Bank of Pennsylvania (the "Bank," and together with the Debtors, the "Parties").

For the reasons set forth below, the Court grants the Motion, albeit with some limitations as set forth in the *Order* entered contemporaneously with this *Memorandum Opinion*.

## I.
## Factual & Procedural History

In 2009, the Debtors sought, and the Bank agreed, to refinance a loan with the Bank. The resulting 2009 home equity line of credit (the "Loan"), was secured by a mortgage on the Debtors' residence (the "Mortgage"), which is the subject of a mortgage foreclosure action in state court.

Prior to the filing of the Motion, this Court granted relief from the automatic stay in favor of the Bank. See *Order Conditionally Granting Relief From Stay*, ECF No. 66; *Affidavit of Default*, ECF No. 70.

The Debtors allege that they became delinquent on the Loan due to a disability suffered by Mr. DeWitt.

In connection with the Loan, the Debtors *believed* that they had obtained both credit life and credit disability insurance coverage for the Loan, as they *believed* they had obtained through the Bank on the prior loan. The Debtors requested the Bank's Loan file (the "Credit File"), and the Bank asserts it has turned over its entire "Credit File." See *Affidavit in Support of Response to*

*Debtor's Motion for Rule 2004 Examination* (the "Lombardo Affidavit"), ECF No. 84-1 ¶ 3.

The Parties agree that the Credit File provides evidence of credit life insurance for the prior loan and the 2009 Loan, but the Bank disputes the Debtors' assertion that the prior loan also included disability insurance (see Motion at ¶¶ 4-6; *First National Bank's Response and Objections to Debtors' Motion for a Rule 2004 Examination* (the "Response"), ECF No. 80 at ¶¶ 4-6). The Parties agree that the documents provided in the Credit File, which is set forth as Exhibit C to the Motion, do not provide documentary evidence that the Loan includes credit disability insurance, but do support the election of credit life insurance.

The Debtors' Motion alleges not only did Mr. DeWitt believe that they had obtained credit disability insurance, but that he was advised by the Bank that there was coverage, but there was a problem with it. See Motion at ¶¶ 11-12. Furthermore, the Motion avers that the "Bank set-off on a closed account and took some of Jerry DeWitt's back social security to pay for a disability insurance policy that was cancelled months before." Id. at ¶ 14.

In articulating the reason for the Rule 2004 examination, the Debtors state:

> The Debtors need to examine the Bank and its servicing and origination records including applicable metatdata to determine the status of any disability insurance including the names of the people involved in this mortgage, the underwriting guidelines and policies concerning any offer of disability insurance (whether the insurance

3

could be issued in the first instance and the rules concerning its disclosure) and the names of the people thereafter involved in servicing the mortgage and other debts the Debtors had.

Motion at ¶13.

In its Response to the Motion, the Bank asserts that it has already provided the Credit File, and the Credit File reveals that no disability insurance was applied for in connection with the Loan. Therefore, the Bank asserts that further discovery "is being improperly employed by the Debtors . . ." because the Credit File was produced, and also that the Court lacks subject-matter jurisdiction. See Response at ¶¶ 1, 1(a), and 1(b). Alternatively, the Bank argues that the "Debtors' argument is barred under principles of collateral estoppel and res judicata," and even if a credit disability insurance policy existed, that no benefit could inure to the bankruptcy estate. See Response at ¶¶ 1(c)-(e). The Bank further alleges that the "Rule 2004 Motion is an unnecessary and overly burdensome waste of judicial resources, time and legal fees." Response at ¶ 1(f).

## II.
## Analysis

Bankruptcy Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Rule 2004 further provides that:

> [t]he examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. In . . . an individual's debt adjustment case under chapter 13, . . . the examination may also

4

> relate to . . . the source of any money . . . to be acquired by the debtor for purposes of consummating a plan . . ., and any other matter relevant to the case or to the formulation of a plan.

Fed. R. Bankr. P. 2004.

> The purpose of a Rule 2004 examination is to "discover the nature and extent of the bankruptcy estate" in order to distribute debtor's assets for the benefit of its creditors. ⁋ "Legitimate goals of Rule 2004 examinations include '**discovering assets**, **examining transactions**, **and determining whether wrongdoing has occurred**.' ⁋ Potential examinees include "third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.⁋
>
> A Rule 2004 examination is not a deposition; it serves a different purpose and is governed by different procedural rules.⁋ "Unlike traditional discovery, which narrowly focuses on the issues germane to the dispute," the scope of Rule 2004 is broad and unfettered, and has been likened to a "fishing expedition" and "an inquisition."⁋ Indeed, a Rule 2004 examination is generally not available once an adversary proceeding or contested matter has been commenced; at that point, discovery is made pursuant to the Federal Rules of Bankruptcy Procedure.⁋
>
> Nevertheless, parties do not have an absolute right to Rule 2004 examinations—the granting of a Rule 2004 examination is dependent on the discretion of the court.⁋ The rule requires a balancing of "the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination."⁋

In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 625–27 (Bankr. D. Del. 2016)(footnotes omitted, emphasis added).

Per order of this Court, the Parties filed briefs in support of their positions. The Debtors' brief articulates more clearly that the examination is aimed at determining whether the Debtors' bankruptcy estate holds a claim for a

"technical violation cause of action under Truth-in-Lending Act for failure to use the proper forms as set forth by the Federal Reserve. 15 U.S.C. §1607(e)(2)."[1] Debtors' Brief, ECF No. 88 at pgs. 2-3.

The Debtors further stated that in addition to the Truth-in-Lending Act claim, the Debtors "requested a Rule 2004 exam in order to determine whether there are any other possible claims related to the absence of insurance . . . ." Debtors' Brief, ECF No. 88 at pg. 3.

---

[1] See also e.g., Reg. Z 12 C.F.R. 1026.4 addressing, inter alia, credit insurance and related disclosures; see also 7 Pa.S.C.A. § 6122:

> (a) Mortgage lenders.--If they are in compliance with the provisions of this chapter, mortgage lenders shall have the power and authority:
> (1) To make first and secondary mortgage loans and, subject to the limitations of this chapter, to charge and collect interest, origination fees and delinquency charges for the loans.
> (2) . . .
> (3) To provide access to credit life, credit disability, credit accident and health and credit unemployment insurance. A consumer shall not be compelled to purchase credit life, credit disability, credit accident and health or credit unemployment insurance as a condition of the making of a mortgage loan, and all contracts utilized shall reflect a clear disclosure that the purchase of credit life, credit disability, credit accident and health or credit unemployment insurance is not a prerequisite to obtaining a mortgage loan. If, however, the consumer elects to obtain credit life, credit disability, credit accident and health or credit unemployment insurance through the licensee, the consumer shall consent thereto in writing. If consumers desire joint-life or joint accident and health insurance, all consumers shall consent thereto in writing. The insurance shall be obtained from an insurance company authorized by the laws of this Commonwealth to conduct business in this Commonwealth. Any benefit or return to the licensee from the sale or provision of the insurance shall not be included in the computation of the maximum charge authorized for mortgage loans under this chapter and shall not be deemed a violation of this chapter when the insurance is written pursuant to the laws of this Commonwealth governing insurance.

Summarizing, that "[t]he requested examination here is to determine if an estate asset exists, and if so, how large of an asset might exist. . . . To put another way, the Debtor seeks a certification that the full file has been provided, and a deposition to determine if there would be anything outside the file, to determine what First National Bank knew about the credit disability insurance, and when it knew it." Debtors' Brief, ECF No. 88 at pgs. 3-4.

> The party seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks. "Generally, good cause is shown if the [Rule 2004] examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." The Trustee has testified that the examinations are necessary to "enable the Plan Trusts to determine the scope of viable claims that may exist on behalf of the Plan trusts against potential third parties that may be culpable for causing such harm to the Debtors."

In re Millennium Lab Holdings II, LLC, 562 B.R. at 627–28 (footnotes omitted)(alteration in the original); in accord In re Orion Healthcorp, Inc., 596 B.R. 228, 235–36 (Bankr. E.D.N.Y. 2019).

The Court is troubled by some of the Bank's answers to the Motion. For example, the Debtors allege that "the Bank set-off a closed account and took some of Jerry DeWitt's back social security to pay **for a disability insurance policy** that was cancelled months before." Motion at ¶ 14 (emphasis added). The Bank responded that the "allegations [in ¶ 14] can neither be confirmed nor denied due to lack of specificity. . . ." Response at ¶14. Preliminarily, the Court

thinks that the Bank should be able to answer this allegation with an unqualified admission or denial.

Further questions arise upon a quick review of the Credit File, which includes a document entitled "Loan Checklist." Motion, Ex. C, pgs. 36-37. One paragraph provides:

> ____ Credit Ins. **Pennsylvania law requires** that certain disclosures be made in connection with group credit life insurance and group credit accident and health insurance if such insurance is offered in connection with a loan that has a duration of twenty (20) years or less which is not secured by a first lien on real estate. You should consult your legal counsel concerning the proper credit insurance disclosures to be given in connection with the loan. 3CLEPA00068

Id. at pg. 37 (emphasis added). The Loan is secured by a second lien on the Debtors' residence. See Motion, Ex. C, pg. 60. The Credit File does include a disclosure with respect to "group credit accident and health insurance," and while it is dated, it is not signed by the Debtors (the "Disclosure"). See Motion, Exhibit C, pg. 103.

The Court gathers from the Debtors' papers that the Debtors wish to inquire as to whether disability insurance was generally offered by the Bank in 2009 in connection with similar loans, and why the Credit File does not include either a signed Disclosure, or a check-the-box type of document which would indicate whether the Debtors elected to obtain credit disability insurance. Neither the Bank's Response nor Brief appear to answer these questions, which appear to be a legitimate area of inquiry based on the Bank's own Checklist and Disclosure.

8

The Bank argues that even if credit disability insurance existed, there would be no benefit to the Debtors' bankruptcy estate as the insurance proceeds would inure to the Bank's benefit. Whether or not there would be equity over the Bank's recovery if there were coverage is worth knowing.[2] More to the point of the Debtors' argument, however, is whether the Bank failed in some obligation to either offer disability coverage or process disability coverage, and if so, whether the Debtors – and their estate – are entitled to damages as a result.

The fact that the Bank has filed an Affidavit certifying that it has turned over the complete Credit File does not answer the questions raised by the Debtors. Three examples of these questions are: (a) what the Bank's practices and policies were in 2008-2009 with respect to disability insurance; (b) whether any payments on account of the Loan (whether by the Debtors or by setoff or otherwise) were applied to credit disability insurance; and (c) whether the Debtors were offered credit disability insurance, and if so, how, and if not, why

---

[2] See e.g., In re Motto, 263 B.R. 187, 193–94 (Bankr. N.D.N.Y. 2001)("Thus, a policy of credit disability insurance vests in the borrower no rights to the proceeds derived from a claim under the policy, rather, it is only after the indebtedness has been satisfied that a borrower gains any rights to surplus proceeds. In the context of bankruptcy, a credit disability insurance policy vests in a debtor only "rights which could potentially affect the proceeds; however; the [d]ebtor does not have the type of legal or equitable ownership interest necessary under § 541(a) to make the proceeds estate property." In re Goodenow, 157 B.R. at 725 (emphasis in original); see also, Johnson v. USAir Federal Credit Union (In re Johnson), 162 B.R. 464, 466 (Bankr. M.D.N.C. 1993)("This court will not elevate the rights of the...debtor to create an interest in a[ ] [credit disability] insurance policy that would not exist but for the bankruptcy filing.") In the instant case, the Debtors had never acquired a vested right in the claim proceeds that were payable to BSB and its predecessors in interest since both by statutory regulation as well as the language of the policy itself, the proceeds could never be paid to the Debtors until the outstanding note is satisfied.")); in accord In re Gladwell, No. 06-82063, 2009 WL 140098, at *4 (Bankr. C.D. Ill. Jan. 21, 2009).

9

not. Proceeds from the claims (if any) the Debtors subsequently choose to bring based on the results of the Rule 2004 examination will inure to the benefit of the Debtors' bankruptcy estate. Thus, the Debtors' Motion with respect to the general practice and policies of the Bank in 2009 pertaining to credit disability insurance, and the Loan's history with respect to credit disability insurance, for the purpose of "discovering assets, examining transactions, and determining whether wrongdoing has occurred" appears to fit squarely within the purpose of Rule 2004. As such, the Debtors have demonstrated good cause warranting granting of the Debtors' Motion.

The Debtors' papers make it clear that they have not determined whether to bring any claim(s) against the Bank at this time. Rather, the Debtors are in the preliminary stages of their review and analysis of the bankruptcy estate's claims, if any, against the Bank. As such, their use of Rule 2004 discovery at this time to identify or evaluate possible claims against the Bank meets the requirements of Rule 2004. See, e.g., In re Gawker Media LLC, No. 16-11700, 2017 WL 2804870, at *6 (Bankr. S.D.N.Y. June 28, 2017) (granting trustee's Rule 2004 discovery where stated purpose of request was to determine whether trustee should commence litigation against the examinees); in accord In re Transmar Commodity Grp. Ltd., No. 16-13625-JLG, 2018 WL 4006324, at *5–6 (Bankr. S.D.N.Y. Aug. 17, 2018)("Indeed, '[l]egitimate goals of Rule 2004 examinations include "discovering assets, examining transactions, and determining whether wrongdoing has occurred." ' In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (citation omitted).")

> In granting a Rule 2004 examination request, the Court is required to make a finding of good cause for the examination. [citations omitted]. In addition, the court must weigh the relevance of the discovery against the burden it will impose on the producing party. In re Coffee Cupboard, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("Rule 2004 requires that we balance the compelling interests of the parties, weighing the relevance of and necessity of the information sought by examination."); see also In re Texaco, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) ("[T]he examination should not be so broad as to be more disruptive and costly to the [producing party] than beneficial to the [requesting party].") The court's determination is reviewed for abuse of discretion. Enron, 281 B.R. at 840.

In re Bibhu LLC, No. 17-10042, 2019 WL 171550, at *2 (Bankr. S.D.N.Y. Jan. 10, 2019).

The Bank also argues that the Debtors' inquiry is barred by the principles of res judicata and collateral estoppel because the Debtors did not raise possible Truth-in-Lending Act defenses to the mortgage foreclosure action or the motion for relief from stay. Preliminarily, the Court agrees with the Debtors that the Pennsylvania Rules of Civil Procedure limit the types of counterclaims that may be asserted in a mortgage foreclosure action. See, e.g., Pa. R. Civ. P. 1148. However, because the Debtors have not asserted a claim at this time, a ruling on whether res judicata and/or collateral estoppel are applicable is not ripe for adjudication.

Finally, the Bank argues that this Court lacks subject-matter jurisdiction to entertain this Motion because the Bank is no longer a creditor of this estate. Response at ¶ 1(b). Nothing in Rule 2004 limits examination to creditors of the estate, but instead the Rule states that "[o]n motion of any party in interest, the

court may order the examination of any entity." <u>See</u> Fed. R. Bankr. P. 2004(a). To the extent the Debtors are pursuing a possible claim that would inure to the benefit of the estate, such examination falls squarely within the express language of Rule 2004.

### III.
### Conclusion

The Court finds that the Debtors have met their burden of showing good cause for the Rule 2004 examination of the Bank with respect to disability insurance.[3] The Bank has not established that such an examination would be unduly burdensome, or any other cause to deny the relief. Accordingly, the Court shall enter an Order granting the Motion.

Dated: November 4, 2019

jlh

**JEFFERY A. DELLER**
United States Bankruptcy Judge

Cc:
David A. Colecchia, Esq.
David W. Raphael, Esq.
Chapter 13 Trustee

FILED
11/4/19 3:49 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

---

[3] In so finding, the Court is not concluding, either positively or negatively, that a cause of action exists upon which the Debtors may seek recovery from the Bank. The Court is only finding that an examination pursuant to Rule 2004 is an appropriate mechanism for further inquiry into and evaluation by the Debtors as to whether a potential bankruptcy estate asset exists.